# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BARRY STERNLICHT, DR. LEWIS GOLD, ELLIOT COOPERSTONE, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2023-0477-PAF |
| MARLOW HERNANDEZ, ANGEL MORALES, JACQUELINE GUICHELAAR, ALAN MUNEY, KIM RIVERA, SOLOMON TRUJILLO, | ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| CANO HEALTH, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  June 9, 2023
Date Decided:  June 14, 2023

John M. Seaman, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Adrienne Ward, Lori Marks-Esterman, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Plaintiffs Dr. Lewis Gold and Elliot Cooperstone.*

John M. Seaman, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Tariq Mundiya, Richard Li, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Plaintiff Barry Sternlicht.*

Blake Rohrbacher, Kevin M. Gallagher, Matthew W. Murphy, Nicole M. Henry, Jordan L. Cramer, Sandy Xu, Mari Boyle, Edmond S. Kim, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Marlow Hernandez, Angel Morales, Jacqueline Guichelaar, Alan Muney, Kim Rivera, Solomon Trujillo, and Nominal Defendant Cano Health, Inc.*

**FIORAVANTI, Vice Chancellor**

Three former directors of Cano Health, Inc. ("Cano" or the "Company") ask the court to issue a preliminary injunction to prevent the Company from holding its annual meeting of stockholders on June 15, 2023 and to enjoin enforcement of the Company's advance notice bylaw. The plaintiffs, who resigned en masse six weeks after the deadline to submit director nominations and stockholder proposals, contend that it would be inequitable to permit enforcement of the bylaw due to a radical change in circumstances at the Company after the deadline. For the reasons that follow, the motion is denied.

## I.    BACKGROUND

The facts are drawn from the record developed in connection with the application for a preliminary injunction. The parties have submitted approximately 250 exhibits and deposition testimony from seven fact witnesses.[1]

After depositions were complete, the plaintiffs submitted an affidavit from plaintiff Elliot Cooperstone in support of their motion for a preliminary injunction. The affidavit was accompanied by two audio files, which were produced the evening before Cooperstone's deposition.[2] Defendants have moved to strike it, arguing that

---

[1] Exhibits are cited as "Ex. #." Documents that do not already contain page numbers are cited using the last three digits of their Bates number. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Unless otherwise indicated, citations to the parties' briefs are to their preliminary injunction briefs.

[2] Dkt. 70.

plaintiffs could have adduced the information in the affidavit by examining Cooperstone at his deposition, which would have been subject to cross-examination. *See Meyers v. Quiz-DIA LLC*, 2017 WL 76997, at \*18 (Del. Ch. Jan. 9, 2017); *Pell v. Kill*, 135 A.3d 764, 770 (Del. Ch. 2016). In the exercise of my discretion, I afford "little if any weight" to the Cooperstone affidavit. *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at \*19 (Del. Ch. May 22, 2000).

What follows are the facts as they are likely to be found after trial, based on the current record.[3]

### A. The Parties

Cano is a primary care provider and population health company. The Company owns and operates medical centers and delivers healthcare services through affiliate relationships with other providers, focusing primarily on coordinating care to members under Medicare Advantage health plans. The Company is incorporated in Delaware and has its principal place of business in Miami, Florida. Dr. Marlow Hernandez and Richard Aguilar co-founded the Company in 2009.[4] Since its inception, Hernandez has acted as the chief executive officer of the Company. Hernandez controls 4.75% of Cano's voting power.[5] Cano

---

[3] Of course, "the eventual findings of fact after trial could be different." *Pell*, 135 A.3d at 770.

[4] Ex. 10.

[5] Ex. 185 at 58.

2

received early investments from Angel Morales and Solomon Trujillo. Trujillo invested in Cano in 2014 and joined its board of directors shortly before the Company went public in June 2021.[6] Jason Conger and Rick Sanchez also became involved with Cano early in its lifecycle. While Cano remained a private company, Hernandez, Aguilar, Morales, Trujillo, Conger, Sanchez, and other early investors held their shares in Cano through an entity called Cano America.[7]

In 2016, InTandem Capital Partners, LLC ("InTandem"), a private equity firm specializing in healthcare, invested in Cano through its affiliate, ITC Rumba, LLC ("ITC Rumba").[8] Following that investment, InTandem's founder and managing partner, Elliot Cooperstone, joined the Cano board. InTandem, through ITC Rumba, currently holds approximately 30.3% of Cano's total voting power.[9]

Dr. Lewis Gold, a prominent anesthesiologist and healthcare entrepreneur, joined Cano's board in 2018. Gold currently holds approximately 1% of Cano's voting power.[10]

On June 3, 2021, Cano went public through a de-SPAC transaction with JAWS Acquisition Corp. ("JAWS"). Barry Sternlicht was the chairman of JAWS

---

[6] Ex. 5 ("Trujillo Dep.") at 24:2–25.

[7] Ex. 6 ("Hernandez Dep.") at 277:24–279:7.

[8] Ex. 2 ("Cooperstone Dep.") at 28:9–29:19.

[9] Ex. 185 at 58.

[10] Ex. 189 at 35.

prior to the merger.[11]  When Cano merged with JAWS, Sternlicht personally invested $50 million in Cano and joined the Cano board of directors.[12]  Around this time, Sternlicht also raised around $800 million through private placement in public equity ("PIPE") financing and introduced Cano to certain institutional investors.[13]  He currently holds approximately 4.8% of the voting power of Cano.[14]

After the merger was consummated, Hernandez ascended to the position of chairman and remained as CEO.  Trujillo, Cooperstone, and Gold also continued as directors, with Trujillo being designated as the Company's "Lead Independent Director."[15]  Morales, Kim Rivera, Dr. Alan Muney, and Jacqueline Guichelaar joined the board after the merger.  Immediately following the merger, Cano's stock was trading at around $15 per share.[16]

Following the merger, Hernandez, Trujillo, Morales, Rivera, Muney, Guichelaar, Sternlicht, Gold, and Cooperstone constituted the Cano board of directors.  Gold, Guichelaar, Muney, Rivera, and Morales served on the Company's

---

[11] Ex. 200.

[12] Ex. 1 ("Sternlicht Dep.") at 193:8–12.

[13] *Id.* at 26:23–29:3.

[14] Ex. 189 at 28.

[15] Ex. 27 at 10.

[16] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical (listing Cano's closing stock price at $15.09 on June 4, 2021).

Audit Committee, which was chaired by Morales.[17]  Rivera, Guichelaar, Trujillo, and Sternlicht served on the Company's Nominating and Corporate Governance Committee (the "Governance Committee"), which Rivera chaired.[18]

Sternlicht, Gold, and Cooperstone (the "Plaintiffs") control 35.7% of the voting power of Cano.[19]  They resigned from the board on or shortly after March 30, 2023.[20]  Hernandez, Trujillo, Morales, Rivera, Muney, and Guichelaar (the "Defendants") currently serve as Cano's board of directors and are each named as defendants in this case.  Cano has a classified board.[21]  The terms of Rivera, Muney, and Cooperstone were to expire at the 2023 annual meeting.[22]  Following the Plaintiffs' resignations, the board reduced its size to six directors.[23]  Rivera and Muney are on the board slate for the 2023 election of directors.[24]

---

[17] Ex. 27 at 16.

[18] *Id.*

[19] Ex. 185 at 28.

[20] Ex. 156; Ex. 157; Ex. 160.

[21] Ex. 202 at Art. VI § 4.

[22] Ex. 85 at '263.

[23] Cano Health, Inc., Annual Report Amendment No. 1 (Form 10-K/A) (Apr. 7, 2023).

[24] Ex. 185 at 13.

## B. Relevant Board Policies

Cano has a policy that no director may pledge Company securities as collateral for a loan unless the Audit Committee first approves the pledge (the "Anti-Pledging Policy").[25] The Company explained in its 2022 proxy statement that it viewed a limited amount of pledging as necessary and appropriate, but as part of its risk oversight function, required the Audit Committee to review any share pledges to assess whether the pledging would pose an undue risk to the Company.[26] According to the Company's 2023 proxy: "As of December 31, 2022, there were no outstanding pledges for our NEOs and directors."[27]

The Audit Committee is also responsible for reviewing all related person transactions, which the Company defines as "any transaction in which the Company is a participant and a Related Person[, including a director or executive officer of the Company,] has a direct or indirect interest."[28]

---

[25] Ex. 13; Ex. 14.

[26] Ex. 27 at 35.

[27] Ex. 185 at 34.

[28] Ex. 12 (the "Related Party Transaction Policy") at App'x A. The Company also has a conflict of interest policy that prevents directors, officers, and employees from engaging in activities that could impair, influence, or interfere with the performance of their duties to the Company or their ability to act in the Company's best interest. *See* Ex. 13 at 3 (the "Conflict of Interest Policy").

## C. Hernandez Leverages His Cano Stock

On August 25, 2021, shortly after the de-SPAC merger, Hernandez pledged 22,034,622 of his shares of Cano's Class B common stock to secure a loan from Citibank, which he used to purchase Cano stock on margin.[29]  On September 27, 2021, Hernandez publicly disclosed this loan in a Schedule 13D filed with the United States Securities and Exchange Commission ("SEC").[30]  Conger, Sanchez, Aguilar, and Morales each opened a margin account with Citibank around the same period.[31] At this time, Conger served as Cano's senior vice president of business development, Aguilar served as Cano's chief clinical officer, and Morales sat on Cano's board of directors.

By late 2021, Cano's stock traded around $9 per share, about 40% below its post-merger trading price.[32]  Hernandez began to face margin calls and explored possible sources of funding.[33]  Among those approached was Robert Camerlinck,

---

[29] Ex. 17 at 6–7; *id.* at Ex. D.  Hernandez pledged these shares through a holding company, Hernandez Borrower Holdings, LLC.

[30] Ex. 17.

[31] Ex. 21 § 5.1(b).

[32] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical.

[33] Hernandez Dep. 185:16–186:23.

the president of Cano's wholly owned subsidiary Healthy Partners, Inc., which Cano had acquired in July 2020.[34]

At a January 26, 2022 board meeting, the Audit Committee shared information on an equity earnout payment to Camerlinck in lieu of a cash payment.[35] At this meeting, Hernandez disclosed that he was considering a loan from Camerlinck. According to the minutes of that meeting: "The Board had no objections to the equity in lieu of cash payment, the disclosure of a potential loan, or to the Audit Committee report addressing [pledging], lock up agreements, and disclosures."[36]

In January 2022, Hernandez and his wife, Stephanie Hernandez, borrowed $10 million from Ventura De Paz (the "De Paz Loan").[37] The loan is memorialized in a January 28, 2022 promissory note.[38] The De Paz Loan provided for a one-year term, maturing on January 28, 2023.[39] Six months earlier, Cano had purchased De Paz's company, Doctor's Medical Center, LLC, for $300 million.[40] Hernandez did

---

[34] *Id.* at 211:13–212:7; *see* Cano Health, Inc., Annual Report (Form 10-K) (Mar. 14, 2022) ("2021 10-K") at 157 (disclosing the acquisition of all assets of Healthy Partners, Inc.).

[35] Ex. 19 at 4.

[36] *Id.*

[37] Ex. 20.

[38] *Id.*

[39] *Id.* § 1.1.

[40] Ex. 16 at 3.

not disclose the De Paz Loan at the January 26 board meeting or any other board meeting in 2022.

On February 28, 2022, Hernandez executed a promissory note and loan agreement providing for a $30 million loan from Camerlinck (the "Camerlinck Loan").[41] Hernandez secured the loan with stock that his wife owned in Dental Excellence Partners, LLP ("Dental Excellence Partners").[42] At that time, Dental Excellence Partners was a contractor of Cano. Aguilar, Conger, and Sanchez guaranteed the Camerlinck Loan.[43] The terms of the Camerlinck Loan required Hernandez to use the loan proceeds to repay part of his debt to Citibank and to make subsequent loans to Aguilar, Conger, and Sanchez to repay their margin loans from Citibank.[44] The loan had a maturity date of February 27, 2023.[45]

In April 2022, Onsite Dental purchased Dental Excellence Partners.[46] At the same time, Cano entered into a strategic partnership with Onsite Dental.[47] Stephanie Hernandez received cash and stock in Onsite Dental in the sale.[48]

---

[41] Ex. 21.

[42] Hernandez Dep. 206:25–207:17.

[43] Ex. 22; Ex. 23; Ex. 24.

[44] Ex. 21 § 5.1(b).

[45] *Id.* § 1.1.

[46] Ex. 28.

[47] *Id.*

[48] Ex. 204.

At a July 21, 2022 board meeting, Hernandez announced that the Company had created the positions of chief operating officer and chief administrative officer and planned to seek the board's approval to appoint Camerlinck and Amy Charley to those positions, respectively.[49] On July 30, 2022, the board approved those appointments.[50] On August 5, 2022, Cano filed a form 8-K, signed by Hernandez, announcing the appointment of Camerlinck as chief operating officer.[51] The disclosure made no mention of the Camerlinck Loan.[52] Cano's securities counsel, Goodwin Procter LLP ("Goodwin"), had not been made aware of the loan when preparing the 8-K.[53]

On August 9, 2022, Cano's general counsel, chief compliance officer, and corporate secretary, David Armstrong, contacted Goodwin regarding the Camerlinck Loan.[54] Armstrong indicated that Hernandez was in default on the first $10 million installment and would likely default on the impending second $10 million installment.[55] Counsel at Goodwin later recalled these discussions, noting:

> I mentioned to [Armstrong] that the Form 8-K requires companies to disclose any arrangements or understandings between the individual

---

[49] Ex. 32.

[50] Ex. 33.

[51] Ex. 34.

[52] *Id.*

[53] Ex. 77 at '460–61.

[54] *Id.* at '460.

[55] *Id.* at '461.

10

appointed (i.e., in this case, [Camerlinck]) or any other person pursuant to which the individual was appointed as COO. I queried whether [Camerlinck] was appointed as COO by [Hernandez] as a result of the loan. A separate question came up as to whether the loan should be disclosed in a stand-alone Form 8-K or the upcoming Form 10-Q. Per Item 404 of Regulation S-K, we got comfortable that the loan did not have to be disclosed because it was a private loan between two parties —and the company was not a party to the loan.[56]

Goodwin "suggested follow up to ensure the Board was informed."[57] Armstrong discussed the loan with Hernandez, who said that he had informed certain directors of the loan, including Morales, chair of the Audit Committee.[58] Armstrong notified Morales and Rivera, chair of the Governance Committee, of the Camerlinck Loan.[59] At Morales's request, Armstrong posted a memorandum about the loan to the Audit Committee on the Company's online portal.[60] Armstrong informed Weil, Gotshal & Manges LLP ("Weil"), counsel to the board, about the Camerlinck Loan and provided Weil with a memorandum discussing the loan.[61]

On August 27, 2022, Rivera convened a special confidential meeting of all committee chairs to discuss the Camerlinck Loan.[62] Michael Aiello of Weil joined

---

[56] *Id.*

[57] Ex. 79 at 1.

[58] Ex. 36; Ex. 79 at 1.

[59] Ex. 37; Ex. 62; Ex. 79 at 2.

[60] Ex. 79 at 2.

[61] *Id.* Armstrong also provided Weil with the loan documents and the memorandum provided to the Audit Committee.

[62] Ex. 79 at 2.

as board counsel, and Hernandez, Lopez, Conger, Armstrong, and other Cano legal staff also attended.[63]  According to a March 11, 2023 timeline of events created by Armstrong:  "Following this special meeting the Directors decided to do nothing about the Camerlinck loan."[64]  Formal minutes were not taken at this meeting.  Gold, Sternlicht, and Cooperstone, were not informed of the issues discussed at that time.

Nevertheless, Cooperstone was generally aware that Hernandez had borrowed money from Camerlinck in mid-summer 2022, although he did not then know the details of that loan.[65]  Gold claims not to have been aware of the Camerlinck Loan at that time, even though he was a member of the Audit Committee, to which Armstrong posted a memo on the subject in August 2022.[66]

### D. Plaintiffs Push for a Sale

As the Cano stock lost its post-merger value, Plaintiffs began pushing the Company to sell.  In November 2022, Sternlicht told the board that the Company must announce that it is for sale and that any other course of action would be

---

[63] *Id.*

[64] Ex. 120 at '796.

[65] Cooperstone Dep. 87:8–15.

[66] Ex. 3 ("Gold Dep.") at 96:4–11; Ex. 36.

negligent.[67] He proclaimed that Cano was on the verge of insolvency and that the current strategy of relying on revolving debt was infeasible.[68]

During this period, Cano was in exclusive talks with CVS to explore a potential acquisition of the Company.[69] When it was publicly disclosed that CVS walked away from a deal in October 2022, Cano's stock price fell dramatically. The Company's stock, which had begun October at around $9 per share, was trading for less than $2 by the end of November.[70] In a November 2022 email exchange, Sternlicht repeated an allegation that Hernandez had told CVS and Humana that the Company was not for sale.[71] Around the same time, Morales complained that Sternlicht had held an unauthorized meeting with Humana and his bankers to discuss a sale and possible price, even though Cano had been in exclusive talks with CVS.[72] Humana has a right of first refusal on any sale of the Company under an Amended and Restated Right of First Refusal Agreement executed in connection with Cano's de-SPAC merger.[73]

---

[67] Ex. 40 at 1.

[68] *Id.*

[69] *Id.* at 2. The CVS deal fell through at the end of October 2022. Cooperstone Dep. 274:8–10.

[70] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical.

[71] Ex. 40 at 3.

[72] *Id.* at 2.

[73] 2021 10-K at 37.

## E. Whistleblowers

Sternlicht had emerged as Hernandez's most vocal critic.[74] In December 2022, Cano's senior vice president of corporate finance, Amy Wilson, complained to Sternlicht regarding Hernandez's activity, including his loans, tax payments, and other transactions.[75] The board's counsel at Weil interviewed Wilson on December 22, 2022. Wilson expressed her concern that Hernandez had taken out loans that she regarded as related party transactions and that no one other than Armstrong, including Cano's accounting team and Goodwin, had the opportunity to review.[76]

On December 30, 2022, the board commissioned a "360 Report," requesting feedback from the Company's senior executives on Hernandez's performance.[77] Muney, chair of the Compensation Committee, sent the report to Trujillo and Rivera on January 7, 2023.[78] The report revealed that the majority of Cano's executives disagreed that Hernandez exemplified values of high ethical awareness, integrity, and fairness.[79] It also included complaints that Hernandez had dragged the Company into distracting and conflicted transactions, lacked professionalism, and has an

---

[74] *See, e.g.*, Ex. 40 at 9–11.

[75] *Id.* at 10.

[76] Ex. 41.

[77] Ex. 43.

[78] Ex. 194.

[79] Ex. 43 at 6.

14

inherent conflict of interest regarding his personal finances.[80] The report was not shared with the full board until March 21, 2023.[81]

On January 11, 2023, Wilson informed Sternlicht that Camerlinck had filed UCC liens against Hernandez, Conger, Aguilar, and Sanchez.[82] Sternlicht emailed Aiello, Rivera, and Cooperstone regarding this allegation.[83] Aiello inquired as to the source of the allegation but acknowledged that he was "sure it's accurate."[84] On January 20, 2023, Sternlicht emailed Aiello, Muney, and Rivera about the UCC filing, reporting that Hernandez, Aguilar, Conger, and Sanchez had granted a first priority lien to Camerlinck in the "Pledged Shares."[85]

Sternlicht also initiated an email chain with Aiello, Gold, Cooperstone, and Muney, inquiring as to the next steps in investigating these loans.[86] Sternlicht expressed his frustration to Aiello, speculating that Hernandez and his fellow indebted executives may be inflating projections and conducting transactions solely to improve their debt position.[87] Sternlicht said, "If that doesn't border on

---

[80] *Id.* at 7.

[81] Ex. 148.

[82] Ex. 46.

[83] Ex. 49.

[84] *Id.*

[85] Ex. 51; Ex. 53.

[86] Ex. 55.

[87] *Id.*

dismissal... I mean what is so hard? Why aren't you reading the riot act to these directors and this Board? I don't get it."[88] Gold tagged on, "I agree with your assessment- our fiduciary duty is to find out exactly who has margin loans and how much."[89]

On January 21, 2023, Hernandez emailed Weil, revealing that in addition to the Camerlinck Loan, he had received three other loans totaling $16 million from individuals who had been bought out in Cano acquisitions.[90] This included the $10 million De Paz Loan as well as a loan from Margarita Quevedo for $4 million and from Joel Lago for $2 million.[91] Cano had acquired Quevedo's family business in June 2021 for $609.7 million and had acquired Lago's company in 2017.[92]

Brian Koppy, Cano's chief financial officer, and Mark Novell, Cano's chief accounting officer, became concerned about the non-disclosure of Hernandez's loans. Koppy sent a four-page email to Sternlicht, Gold, and Cooperstone, explaining that the finance team needed information and guidance as to whether the loans needed to be disclosed in the 10-K.[93] Gold responded to Koppy: "We are

---

[88] *Id.* at '461 (cleaned up).

[89] *Id.*

[90] Ex. 57 at '188–90.

[91] *Id.*

[92] Ex. 8 at 2–3; 2021 10-K at Ex. 2.3.

[93] Ex. 61.

aware of this and [are] discussing with outside counsel / obviously we will do the right thing once counsel advises – I appreciate you sharing and bringing this to our attention (we have been working on this)."[94]  Plaintiffs forwarded Koppy's email to Aiello and Rivera.[95]  Sternlicht had seen enough.  In an email to Rivera and Aiello, copying Cooperstone, Gold, and Muney, Sternlicht wrote, in pertinent part:

> This is as bright a RED FLASHING LIGHT as you can have and the Board should be shot for not doing something right now.  I think we need to have a Board meeting and get this information THIS WEEK. No more… manana.[96]

Rivera responded to the group that "there is no reason the full board (other than [Morales]) potentially shouldn't have full visibility into [Koppy's] note."[97]  Rivera then wrote separately to Aiello:

> I think we may have hit a tipping point with [Koppy] (and other mgmt) openly going to three board members only, multiple directors calling for [Sternlicht] to be investigated/removed, and [Sternlicht] threatening to sue us.  Not to mention the implication that [Armstrong] is hiding the ball.  I am concerned that we cannot continue our current approach.[98]

Rivera also texted Trujillo:  "[W]e have a new issue with [Koppy] now raising issues formally with Lew, Barry and Elliott."[99]  After a call with Cooperstone, Gold,

---

[94] Ex. 59 at '648 (cleaned up).

[95] *Id.*

[96] *Id.* (cleaned up).

[97] Ex. 61 at '913.  Morales was identified in Koppy's email as a recipient of funds from the Camerlinck Loan.  *Id.* at '917.

[98] *Id.* at '913.

[99] Ex. 58.

17

Sternlicht, and counsel from Weil, Rivera wrote separately to Weil, "It's important that we not fall into a pattern of updating subsets of the board. Please help me ensure that, unless there is a specific reason, we provide updates to the full board."[100]

Also in January 2023, Amy Charley, the chief administrative officer of Cano, raised concerns to Weil regarding payments from Cano to Cano Builders USA Inc. ("Cano Builders"), an entity owned by Hernandez's father.[101] Charley believed that there was a lack of clarity surrounding the Company's relationship with Cano Builders.[102]

As Plaintiffs began receiving complaints about Hernandez from management, the Company was also in discussions with Humana to acquire more financing.[103] Cano had signed a convertible note agreement and certain collaboration agreements with Humana in 2020.[104] The Plaintiffs hoped to finalize a transaction with Humana before addressing the concerns about Hernandez.[105]

---

[100] Ex. 65.

[101] Ex. 70.

[102] *Id.*

[103] Ex. 213 ("[D]uring the last Board meeting we instructed management, the special Board Committee (Angel & Lew), and our advisors to pursue the Humana transaction and any viable alternative avenue.").

[104] Ex. 35.

[105] Ex. 60 (replying to Koppy's email detailing concerns about Hernandez with the statement that "my hope is that we get Hum deal done next week and immediately address this issue"); *see also* Ex. 63 ("Do you mean where do we stand on closing Humana? That is all Barry, Elliott, Lew and Amy (newest board member) care about." (cleaned up)).

### F. Preparing the 2022 10-K

On February 2, 2023, Cano's chief accounting officer prepared an Audit Committee deck that contained a proposed draft of a related party disclosure for the 10-K relating to Hernandez's loans.[106] Meeting resistance from Morales, Novell reached out to Goodwin, which advised him that "given the materiality of the loans and the perceived conflict of interest," there should be "some disclosure in the upcoming 10-K – whether it be in the related party transaction and/or risk factors – about these loans as the information could be arguably material to an investor."[107] Weil instructed Cano's general counsel to pull the slide from the deck for now, noting that it could be revisited once Weil had reported its findings to the board.[108]

Meanwhile, Sternlicht's distrust of Weil and frustration with the pace of its investigation was growing.[109] On February 1, 2023, Sternlicht fumed to Weil, Cooperstone, and Gold, "This company has $20m of unrestricted cash and $20m left on its credit line. They are struggling to do a cash flow forecast. Rome isn't just burning… it's in flames… and we wait and wait and wait. If this doesn't warrant an

---

[106] Ex. 77 at '462.

[107] *Id.* at '461.

[108] *Id.* at '459.

[109] *See* Ex. 107 (noting Sternlicht's "serious reservations about Weil Gotshal advice and conflicts of interest which [he had] repeatedly raised").

off cycle Board update... what does?"[110]  Sternlicht also disclosed that he had been

receiving reports from "two moles" in management.[111]

On February 4, 2023, Weil indicated that the board would meet in advance of

its regularly scheduled board meeting to discuss the loans and related matters and

would discuss the disclosure of the loans at that juncture.[112]  Cooperstone emailed

Aiello at Weil, indicating that he believed multiple members of management had

lost faith in Hernandez and that the board should decide after Weil's report whether

to remove the CEO.[113]  The board convened a call on Sunday, February 5, 2023, to

discuss the four personal loans, as well as loans from InTandem's affiliate to cover

the taxes of former Cano America members as a result of the de-SPAC transaction.[114]

Weil delivered its findings and preliminary recommendations, concluding that the

loans violated the Company's Conflict of Interest Policy as they could raise a specter

of impropriety or favorable treatment given their size and the business relationship

between Hernandez and the lender.[115]  However, Weil determined that the loans did

not appear to violate the Company's Related Party Transaction or Anti-Pledging

---

[110] Ex. 73 at '312–13 (cleaned up).

[111] *Id.* at '312.

[112] Ex. 77 at '456.

[113] Ex. 78.

[114] Ex. 220.

[115] *Id.*; Ex. 219.

Policy.[116]  Weil recommended that the board address the ramifications of Hernandez's failure to follow the conflicts policy and consider engaging an outside consultant for training on procedures.[117]  It also advised that the Company should consider strengthening its compliance policies, particularly surrounding potential conflicts of interest, transparency, and personal loans.[118]

The board held its regularly scheduled board meeting on February 7 and meetings of the standing committees on February 8, which included further conversation about Weil's investigation.[119]  In the Audit Committee presentation, Weil advised that "this matter is not ripe for determination at this time," referring to whether the loans needed to be disclosed in the 10-K.[120]  Weil indicated that it would issue its "findings and recommendations upon completion of their review."[121]

The Governance Committee met on February 8 to set the date for the annual meeting and determine the board slate.[122]  A slide deck prepared in advance of the meeting, and apparently posted to the online board portal, indicated that the annual meeting would be held on June 28 and contained a draft resolution nominating

---

[116] Ex. 219 at 6.

[117] *Id.* at 7.

[118] *Id.*

[119] Ex. 84; Ex. 85.

[120] Ex. 7 ("Rivera Dep.") at 163:10–21.

[121] Ex. 84 at 8.

[122] Ex. 89.

21

Cooperstone, Rivera, and Muney as the Class II directors.[123]  After reviewing those materials, Morales texted Rivera, Hernandez, and Trujillo:  "Let's try to talk today among the four of us.  I just read the Nom & Gov recommendations related to the Proxy.  If we are proposing [Cooperstone] to the Board for another three years, I will not serve."[124]  On February 8, 2023, the Governance Committee resolved to set June 28, 2023 as the 2023 annual meeting date.[125]  The committee deferred consideration of the nominees for the three seats left open by the expiry of Rivera, Muney, and Cooperstone's terms.[126]  Rivera indicated that the decision on board nominees was deferred because Cooperstone had previously indicated a desire to be bought out, and Rivera considered there to be a possibility of Cooperstone being bought out and concurrently stepping down from the board.[127]

In a February 14, 2023 email from Rivera to Morales, Muney, and Trujillo, Rivera said that they need to align on a slate of directors and approach to board structure.[128]  Rivera suggested meeting that weekend.[129]  Morales responded that he was "in favor of nominating [Rivera] and [Muney], but not [Cooperstone], for re-

---

[123] Ex. 85 at '267.

[124] Ex. 86.

[125] Ex. 89 at '289.

[126] *Id.*

[127] Rivera Dep. at 66:6–24.

[128] Ex. 94 at '081–82.

[129] *Id.* at '082.

election. [Sternlicht] has also been clear about his desire to resign from the Board, and we should accept his resignation."[130] Muney responded that he agreed with Morales, but clarified that Sternlicht had indicated that he would resign only if Hernandez was not removed.[131] Muney added that he "assumed" that Rivera meant that the Company would keep Hernandez on as CEO, but require more monitoring, and potentially split his roles as CEO and chairman or require him to unwind his current conflicts.[132] Rivera did not indicate whether she favored renominating Cooperstone.[133] Trujillo replied that they should wait on making any recommendations until they met together.[134]

As the March 1 filing date for the 10-K drew ever nearer, Novell and Koppy continued to press for a legal opinion concerning the disclosure of Hernandez's transactions.[135] Weil refused to deliver a written opinion.[136] After repeated pushing from Novell, on February 18, Weil sent a one-sentence email confirming its view, based on its investigation, "that it is reasonable to conclude that no disclosure is

---

[130] *Id.* at '081.

[131] *Id.*

[132] *Id.*

[133] *Id.* at '080.

[134] *Id.*

[135] Ex. 95.

[136] Ex. 96.

required regarding" the personal loans received by Hernandez.[137]  At an Audit Committee meeting on February 23, Weil reported on its investigation, affirming that disclosure was not required.[138]  Ernst and Young ("EY"), the Company's independent auditor, reached a similar conclusion.[139]

On March 2, 2023, Sternlicht emailed the board.[140]  Calling the previous day's earning call "a joke," Sternlicht stated that he would "attend this one last Board meeting, and then if we don't make real and substantial changes, including removing [Hernandez] as CEO . . . I will resign.  I will also resign w[ith] a full public statement of why I was resigning."[141]

In reaction to Sternlicht's email, Morales, Rivera, Muney, and Trujillo discussed potentially retaining separate counsel from Vinson & Elkins LLP ("V&E").[142]  Morales said, "I've been arguing to deal with him for months so not a moment too soon as far as I'm concerned."[143]  At this stage, Rivera noted that "[Sternlicht's] threats started to escalate, his threats, the intensity, the frequency, the nature, you know, in both board meetings, in email, in texts.  And so there was a real

---

[137] Ex. 97.

[138] Ex. 103.

[139] *Id.*

[140] Ex. 107 at '656.

[141] *Id.*

[142] Ex. 106.

[143] *Id.*

24

concern about whether or not we needed to take steps to make sure that the board and the company were doing the right things to protect themselves."[144]

In a March 7, 2023 board meeting, Weil provide a second oral report regarding its investigation of the Hernandez loans.[145] Aiello confirmed Weil's initial finding that the Company's Conflict of Interest Policy was not followed on certain occasions by certain board members and executives of the Company, but as previously discussed with the board, there was no evidence to suggest that there was any violation of the Company's Related Party Transaction Policy or the Company's Anti-Pledging Policy.[146] As Weil had previously reported, the violations of the Conflict of Interest Policy included Hernandez's loans and the loans that Cooperstone's ITC Rumba had made to certain directors in April 2022.[147] Weil also "advised the Board that in the course of our inquiry, we were made aware of certain insider-related/affiliate transactions – separate from the loans – that should be reviewed and that, given what we had heard, the Board should make confirm [sic] that there are no other similar transactions and that, as part of the remediation, that be appropriately addressed."[148]

---

[144] Rivera Dep. 195:20–196:4.

[145] Ex. 114.

[146] *Id.*

[147] *Id.*; Ex. 82.

[148] Ex. 135 at '150.

EY required the Audit Committee and Trujillo to sign a letter representing: "Based on the findings of the Investigation by Legal Counsel, the Company's Board of Directors and management are considering, timely and appropriate remedial action as considered necessary."[149] The board discussed potential remediation measures, including changes to management, including the CEO, CFO, and general counsel, the possibility of hiring an outside consultant, and changes to their standing policies and governance structure.[150] At that stage, the board ruled out termination of the CFO and CEO, but continued to discuss taking other action, such as revising their compliance policies and taking remedial action as to Hernandez, possibly by separating his roles as chairman and CEO.[151]

## G. Relations Break Down Between Board Factions

With Gold, Sternlicht, and Cooperstone constantly pressing for asset sales and Hernandez's removal, the board continued to fracture.[152] On March 8, 2023,

---

[149] Ex. 196.

[150] Rivera Dep. 150:12–152:3.

[151] *Id.*; Ex. 114.

[152] *See, e.g.*, Ex. 108 ("It goes without saying that I strongly favor selling ALL non florida assets if we can get anywhere near the 100-150m the bankers have said they are worth."); Ex. 115 (listing a discussion or vote "on whether Cano can and should continue as an independent public company and whether we should plan to sell Cano Holdco within X days (once non-core assets have been sold) and should prepare for that process now and be prepared to announce the process once ready."); Ex. 107 ("I will attend this one last Board meeting, and then if we don't make real and substantial changes, including removing Marlowe as CEO and Jason Conger as his attaché in crime, I will resign. I will also resign w[ith] a full public statement of why I was resigning.").

26

Sternlicht sent Cooperstone and Gold a startled message, alleging that he had learned from his "mole" that the 10-K will not be filed on time and that management intended to "dump tens of millions of stock the second the window opens."[153] Gold replied with his plan, one that Plaintiffs had heard from Gold before: fire Hernandez, Conger, Aguilar, and Pedro Cordero, form a new management team with those loyal to Plaintiffs, including Charley, Wilson, and Koppy, and commence an "immediate national search for [a] major healthcare CEO."[154] Cooperstone replied: "Whomever we hire, it should be a short term gig to sell the company."[155]

The following day, Sternlicht sent Hernandez a three-page email titled "The future of Cano," expressing his criticisms of Hernandez's performance, the loss of Cano's stock value, Hernandez's related party transactions, and his belief that Hernandez was treating Cano "as your personal piggy bank, almost assuming no one would notice."[156] Sternlicht reiterated his threat to resign as a director and to issue a public statement explaining his reasons for doing so if Hernandez would not step down as CEO.[157] Trujillo, Cooperstone, and Rivera were copied on the message.[158]

---

[153] Ex. 225.

[154] *Id.*

[155] *Id.*

[156] Ex. 124.

[157] *Id.*

[158] *Id.*

On March 14, 2023, Sternlicht forwarded the message to Morales, Muney, Aiello, Guichelaar, and Gold, referring to the Company as a "cesspool."[159] Sternlicht informed the recipients that, with the help of counsel, he had prepared a public announcement regarding his departure from the board. Later that day, V&E sent drafts of board resolutions and a special committee charter to Rivera, Trujillo, Muney, and Morales.[160]

The board met on March 17, 2023. At this meeting, the Defendants proposed and resolved, over the objection of Sternlicht, Cooperstone, and Gold, that the board create a special committee consisting of Rivera, Trujillo, Morales, Muney and Guichelaar "in response to Barry Sternlicht's plan to publicly disclose his critiques of the Company" (the "Special Committee").[161] The Special Committee's charter authorized it to retain advisers, to respond on the Company's behalf to any public statements made by Sternlicht, to make decisions related to communications between the Company and its stockholders, to negotiate and make recommendations to the board regarding settlements with stockholders "notwithstanding any such stockholder's designation as a member of the Board," and "all such other actions

---

[159] *Id.*

[160] Ex. 126 at 1–2.

[161] Ex. 127 at 1.

28

that the Special Committee may determine are necessary or advisable in connection with the Purpose of the Committee."[162]

The full board met on March 20, 2023.[163] Gold raised an issue with Cano's payments to Cano Builders, a company owned by Hernandez's father, Jose Hernandez.[164] He also alleged that Jose Hernandez received compensation for marketing services provided through entities named "Imago" and "Immersion," which Hernandez denied.[165] The board also discussed the Company's relationship with Onsite Dental, a company owned in part by Hernandez's wife.[166] The board moved on to discussing potential asset sales, including the possible divestiture of Medicaid businesses and non-core assets.[167] Sternlicht pointed out that the Company's stock was trading below a dollar per share, urging the Company to announce a sale of assets.[168] Hernandez explained that the Company planned to seek approval of a reverse stock split to address the low stock price.[169]

---

[162] *Id.*

[163] Ex. 131. Guichelaar was not present at this meeting.

[164] *Id.* at '040.

[165] *Id.* at '041.

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.* at '042.

On March 21, Gold sent an email to the board relaying what he knew about potential related party transactions involving Hernandez's family members.[170] Gold alleged that Hernandez's father, Jose Hernandez, owned Cano Builders, a company that Cano paid over $7.8 million in fees the previous year.[171] Gold asserted that the Company had two companies in its system named "Immersion," one owned by Hernandez' father and the other owned by Elizabeth Morales.[172] Imago, another marketing company associated with Hernandez's father, was paid $1.35 million for marketing.[173] Gold alleged that Hernandez's father also ran "Cano sports[,] Clav[e] Guajira, and Viva la vida" and had requested fees from Cano through those entities.[174] Muney replied to Gold, saying that he had just reviewed those allegations with Hernandez, and explained Hernandez's view that the allegations were probably from Charley and not based on fact.[175] He also relayed that "[Hernandez] is unaware of any company named Immersion."[176]

In an email to the Special Committee and its advisers, Rivera wrote that she wanted to "strongly discourage you from engaging in any further back and forth with

---

[170] Ex. 135.

[171] *Id.* at '152.

[172] *Id.* Gold suggested that Elizabeth Morales may have some relation to Angel Morales.

[173] *Id.* at '153.

[174] *Id.*

[175] *Id.* at '151–52.

[176] *Id.*

Lew or any other board member. We don't know all the facts. It's dangerous to make statements that aren't underpinned by objective investigation and we should not be parroting Marlow's defenses."[177] Also on March 21, Muney finally circulated the 360 Report to the full board.[178]

In the meantime, Weil formulated a plan to focus its investigation on three areas: (1) transactions between Cano and Hernandez's father relating to various marketing vehicles; (2) transactions between Cano and Hernandez's father relating to his general contracting company, Cano Builders; and (3) other related party transactions.[179] Weil planned to provide an oral summary of its findings regarding the first topic on or around March 29–30, with an interim status update on the two other topics at the same juncture.[180]

The full board met on March 30, 2023.[181] At the outset of the nearly two-hour meeting, Trujillo announced there were two purposes for the meeting: for Weil to present its findings regarding Hernandez's family's related party transactions and for the Special Committee to present recommendations for remediation.[182] Weil

---

[177] Ex. 132.

[178] Ex. 148.

[179] Ex. 142.

[180] *Id.*

[181] Ex. 158.

[182] *Id.* at 1.

informed the board that there is no evidence to support a conclusion that Jose Hernandez had a stake in Imago, that it cannot say with certainty that Jose Hernandez has a stake in Immersion and "remain seriously concerned" regarding that business, and that it does not believe that Hernandez "made any representations regarding his father in statements to the Board."[183] Weil also noted that "Jose's involvement with Imago and Immersion is troubling, creates appearance of conflict of interest or issues with related party transactions, and should have been addressed earlier."[184]

The board next turned to the Special Committee's recommendations. After questions were raised about the committee's composition and mandate, Gold questioned why the Special Committee prepared its recommendations before receiving Weil's report.[185] Muney replied that "the recommendations would be the same no matter what the outcome of the investigation is/was."[186] The Special Committee then presented its four recommendations: (1) that Hernandez be removed as chairman of the board, but remain a director; (2) that the Company hire a new general counsel, chief financial officer, and add an investor relations role; (3) that the Company create a probationary period for Hernandez to improve Company

---

[183] *Id.* at 4.

[184] *Id.* at 1.

[185] *Id.* at 5.

[186] *Id.*

performance; and (4) that Hernandez work with an executive coach.[187] Weil clarified that it had not reviewed the Special Committee's recommendations in advance, which was "highly unusual."[188] Aiello said that "Weil may need to consider whether we can go forward with the representation and whether we can effectively advise the Board given the circumstances."[189]

During the meeting, Trujillo pushed the board to take a vote, and the Plaintiffs asked Weil if the board could vote without the full scope of information.[190] Ultimately, the board voted. Gold voted no and announced that he would formally resign from the board. Sternlicht voted no and stated that he would consider resigning from the board. Cooperstone abstained from the vote.[191] Morales, Trujillo, Guichelaar, Muney, and Rivera all voted in favor of the Special Committee's recommendations.[192] In the days that followed, Sternlicht and

---

[187] *Id.* at 6.

[188] *Id.* at 7.

[189] *Id.*

[190] Plaintiffs contend that Weil's investigation was terminated at the March 30, 2023 meeting. In late April, Weil finalized a new work plan with the Cano board that focused on investigating the related party transactions between Cano and Hernandez's family members. Ex. 168; Ex. 242. Plaintiffs argue that the "re-start" of the investigation on April 24, 2023 was due only to Plaintiffs' noisy resignations. Pls.' Reply Br. 17 n.8.

[191] Ex. 158 at 7.

[192] *Id.*

Cooperstone also resigned from the Cano board.[193]   The coordinated resignations had been part of a plan that had been in the works for weeks.

### H. Plaintiffs' Scheme

As the foregoing events played out through March, the Plaintiffs were strategizing to convince the board to sell the Company or to buy out their stock. Sternlicht and Cooperstone in particular had been pushing for a sale since at least November and were frustrated with the opposition that they received.[194]   They viewed Hernandez as the biggest obstacle, believing he had told CVS and Humana that the Company was not for sale.[195]

On March 11, 2023, Cooperstone emailed Sternlicht and Gold his "suggestion for how to proceed with the threat of a noisy resignation to secure the board votes we need."[196]   First, they would demand that the board launch the Company into an auction and remove Hernandez as CEO.  If asking nicely failed to convince the holdouts, Cooperstone would threaten to resign.  Cooperstone theorized that the threat of a noisy resignation coupled with the prospect of civil liability and risks to their personal reputations would force the other directors to

---

[193] Ex. 156; Ex. 157; Ex. 160.

[194] Ex. 40 at 1; *id.* at 3; Ex. 115.

[195] Ex. 40 at 3.

[196] Ex. 227.

come around.[197]  If the board still opposed a short-term sale of the Company, Plaintiffs would either launch a proxy contest, coupled with litigation or threat thereof, or sell their shares to a third-party who could launch a future proxy contest.[198]  By March 17, 2023, Plaintiffs had engaged counsel and were discussing the logistics of a proxy contest.[199]  Despite their apparent motivation to nominate a competing slate, however, they made a calculated decision not to act promptly. Cooperstone told his compatriots:  "No need to rush here – time is actually building some leverage for us."[200]  They did wait—resigning about 13 days later and waiting 28 days before finally demanding that the board allow them to nominate a competing slate.

## I.  Post-Resignation Events

On April 4, 2023, Plaintiffs filed a group agreement under Section 13(d) of the Securities Exchange Act of 1934.[201]  The filing disclosed that Cooperstone, Sternlicht, and Gold had each resigned from the Cano board on March 30 and attached Cooperstone's resignation letter.[202]  On April 6, 2023, Hernandez filed a

---

[197] *Id.* at '391.

[198] *Id.* at '392.

[199] Ex. 197.

[200] *Id.* at '610.

[201] Cano Health, Inc., Beneficial Ownership Report (Schedule 13D) (Apr. 4, 2023).

[202] *Id.*

Schedule 13D/A with the SEC disclosing the Camerlinck Loan and that Hernandez and his guarantors had agreed to transfer 20 million shares of Cano stock to Camerlinck to repay the loan, subject to a buyback option.[203] On April 7, 2023, Cano filed an amended annual report disclosing the resignation of the Plaintiffs and announcing that it had reduced the board's size to six directors.[204]

On April 14, 2023, Plaintiffs sent a letter to Weil explaining that the recent disclosures by Hernandez and the Company, together with the changes at the Company that occurred after the February 15 nomination deadline, constituted material changes that required the board to immediately reopen the nomination window for thirty days.[205] At that time, Plaintiffs did not submit a nomination proposal or otherwise attempt to comply with any of the requirements of the advance notice bylaw.[206] The Company did not respond to Plaintiffs' letter.

On April 17, 2023, the Company announced that Trujillo would replace Hernandez as chairman of the board.[207] On April 24, 2023, Weil provided Defendants with an updated work plan, which states that Weil will investigate, and

---

[203] Ex. 162.

[204] Cano Health, Inc., Annual Report Amendment No. 1 (Form 10-K/A) (Apr. 7, 2023).

[205] Ex. 165.

[206] Cooperstone's ITC Rumba submitted a formal nomination notice on May 18, 2023. *See* Ex. 184.

[207] Ex. 166.

will hire an adviser to perform background checks, regarding "Hernandez family related party transaction concerns."[208]

## J. Procedural History

On April 28, 2023, the Plaintiffs filed their complaint in this action, seeking to enjoin the Company from enforcing the deadline in the advance notice bylaw and adjourning the 2023 annual meeting.[209] The Plaintiffs moved to expedite the proceedings, initially seeking a one-day trial on their application for a mandatory injunction prior to June 16, 2023.[210] That request was based on Plaintiffs' understanding that the meeting would be held on June 28. But on April 27, before Plaintiffs filed their complaint, Cano decided to set the annual meeting date on June 15 and to use a record date of May 8.[211] On May 1, Plaintiffs learned that the Company had scheduled the annual meeting for June 15. On May 3, Plaintiffs filed a motion for a preliminary injunction seeking to enjoin the meeting until this case is resolved.[212] The court ruled that the case would proceed on an expedited preliminary injunction motion to enjoin the annual meeting and to order waiver of the advance

---

[208] Ex. 168.

[209] Dkt. 1 ("Compl.").

[210] *Id.*

[211] Ex. 169.

[212] Dkt. 12.

notice bylaw.[213] The parties conducted expedited discovery and the court held a half-day preliminary injunction hearing on June 9, 2023.

## II. ANALYSIS

Plaintiffs ask this court to issue an order (a) enjoining Cano from enforcing the advance notice bylaw; (b) setting June 21, 2023 as the record date for Cano's 2023 annual meeting; and (c) setting July 26, 2023 as Cano's annual meeting date.[214]

"The Court of Chancery has broad discretion in granting or denying a preliminary injunction." *Data Gen. Corp. v. Digit. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972). To obtain a preliminary injunction, Plaintiffs must establish (1) a reasonable probability of success on the merits, (2) that they will suffer irreparable harm if an injunction is not granted, and (3) that the harm to Plaintiffs if the injunction does not issue will exceed the harm to the Defendants if the injunction does issue. *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 976 (Del. 2020).

### A. Reasonable Probability of Success on the Merits

Plaintiffs must establish a reasonable probability that they will succeed on their claim that the Cano directors have a fiduciary duty to waive the advance notice bylaw in this circumstance. "This showing 'falls well short of that which would be

---

[213] Dkt. 47.

[214] Pls.' Opening Br. 46.

required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made.'" *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

It is well established that stockholders have a fundamental right to "vote for the directors that the shareholder[s] want[] to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). Subsumed within that fundamental right to vote is the right to nominate a competing slate. *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *5 (Del. Ch. Jan. 14, 1991); *accord Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *8 (Del. Ch. Feb. 14, 2022); *Linton v. Everett*, 1997 WL 441189, at *9 (Del. Ch. July 31, 1997). Beyond the statutory requirement that corporations hold an annual meeting to elect directors, the Delaware General Corporation Law enables corporations to set standards and procedures that govern the director nomination process. *See* 8 *Del. C.* § 211(b); *id.* § 109(b). It is now common for corporate boards to establish these procedures in "advance notice bylaws." *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007).

Advance notice bylaws require stockholders to provide the corporation with prior notice of their intention to make stockholder proposals or to nominate directors

39

and to supply information about their proposals or nominees. *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 43 (Del. Ch. 1998), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998). These types of bylaws serve dual purposes: marshalling orderly meetings and election contests where the nominees are fixed in advance of the annual meeting, and providing fair warning to the corporation so that it can respond to stockholder nominations. *Openwave*, 924 A.2d at 239; *Lee Enters.*, 2022 WL 453607, at *9. Cano's advance notice bylaw states, in pertinent part:

> To be timely, a stockholder's written notice shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the one-year anniversary of the preceding year's Annual Meeting.[215]

The 2022 annual meeting was held on May 16, 2022. Accordingly, under the bylaw, written notice of nominations or business to be brought at the 2023 annual meeting was due by February 15, 2023.

A stockholder challenge to the application of an advance notice bylaw presents a series of questions. First, is the bylaw valid on its face? Second, did the stockholder's nomination comply with the terms of the bylaws? Third, if the first two criteria are met, is there some basis in equity to excuse strict compliance with

---

[215] Ex. 15 § 2(a)(2).

the bylaw? *See Lee Enters.*, 2022 WL 453607, at *9. It is this third question that animates this case.

### 1. The *Schnell* Doctrine

In *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437 (Del. 1971), the Delaware Supreme Court reaffirmed the long-standing principle that "inequitable action does not become permissible simply because it is legally possible." *Id.* at 439. In *Schnell*, the board, knowing of an impending proxy contest, advanced the date of the annual stockholders' meeting by approximately one month and moved the location of the meeting to upstate New York. *Id.* The board's conduct was held to be inequitable because the dissidents had already geared their campaign to the announced meeting date, and the board's actions gave the dissidents little chance to prepare a proxy contest. *Id.* The Delaware Supreme Court accepted this court's finding that management had attempted to militarize the corporate machinery and Delaware law to entrench itself by "obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management." *Id.*

The Delaware Supreme Court has repeatedly upheld the principles of *Schnell*. *See, e.g.*, *Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960 (Del. 2021) (invoking *Schnell* in the context of a dilutive stock issuance); *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (describing the *Schnell* doctrine as "[o]ne of the most

41

venerable precepts of Delaware's common law corporate jurisprudence"); *Bäcker v. Palisades Growth Cap. II, LP*, 246 A.3d 81, 96 (Del. 2021) (applying *Schnell* to hold that certain boardroom deceptions were inequitable, even though defendants may have complied with the company's governing documents). *Schnell* embodies the fundamental power of equity. But that power should not be invoked lightly. The flexibility of equity, as delineated in *Schnell*, "should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right." *Alabama By-Products Corp. v. Neal*, 588 A.2d 255, 256 n.1 (Del. 1991);[216] *see In re WeWork Litig.*, 250 A.3d 976, 996 (Del. Ch. 2020) ("'[C]ase law is indicative of a healthy inclination on the part of the judiciary to employ the *Schnell* principle of 'legal but inequitable' only sparingly'" (citation omitted)); *Accipiter Life Scis. Fund, L.P. v. Helfer*, 905 A.2d 115, 127 (Del. Ch. 2006) (noting that "extraordinary facts" must underlie a *Schnell* claim); *Coster v. UIP Cos., Inc.*, 2022 WL 1299127, at *7 (Del. Ch. May 2, 2022) ("The elusive nature of *Schnell* as a standard and potentially harsh consequences of its application

---

[216] This statement in *Alabama By-Products* was issued just a few weeks after the *Hubbard* decision, which had been the subject of an appeal, but was settled after the filing of the appellants' opening brief. *See* 2 David A. Drexler et al., *Delaware Corporate Law and Practice* § 25.10[1][a] (2023). The Drexler treatise suggests that the footnote in *Alabama By-Products* was directed to the *Hubbard* decision and some of the points raised in the appeal brief, leading the authors of the treatise to conclude that "the significance of the *Hubbard* precedent is, perhaps, suspect." *Id.* On a related note, the parties here did not cite and the court did not identify any published decision of the Delaware Supreme Court citing *Hubbard*.

provide good reasons to limit *Schnell*'s application."); Leo E. Strine, Jr., *If Corporate Action Is Lawful, Presumably There Are Circumstances in Which It Is Equitable to Take That Action: The Implicit Corollary to the Rule of* Schnell v. Chris–Craft, 60 Bus. Law. 877, 893 n.68 (2005) ("*Schnell*'s tradition cautions against a literal reading of the quoted language, which is better read as manifesting a recognition that equity should not lightly impede actions authorized by law.").

Cases challenging the application of an otherwise valid advance notice bylaw present a context-specific application of *Schnell*. *AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *5 (Del. Ch. Dec. 16, 2014); *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987) (enjoining further postponement of the company's annual meeting where the company learned that management's slate was likely to lose to the dissident slate); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 914 (Del. Ch. 1980) (holding that bylaw requiring 70-days' notice for nominations was inequitable because it was not announced until 63 days before the meeting was to occur, making compliance impossible); *Linton v. Everett*, 1997 WL 441189, at *9–10 (Del. Ch. July 31, 1997) (setting aside election of directors where an annual meeting had not been held in three years and the board announced a meeting on 30-days' notice, triggering a ten-day window to propose nominees).

Plaintiffs have framed their claim within the context-specific application of the *Schnell* doctrine recognized in *Hubbard*.[217] In *Hubbard*, the court held that the board had a duty to waive an advance notice bylaw provision under the principles of *Schnell* where a "radical shift in position, or a material change in circumstances" had occurred after the deadline for nominations had passed. *Hubbard*, 1991 WL 3151, at \*12. Neither the court nor the parties have been able to identify any decision of this court in the ensuing 32 years enjoining the application of an advance notice bylaw in reliance on *Hubbard*. Before applying its principles to the facts and circumstances of this case, it is important to review *Hubbard* within the *Schnell* framework.

In *Hubbard*, an insurgent stockholder brought suit to enjoin an advance notice bylaw. *Id.* at \*3. He then reached a settlement agreement with the company that

---

[217] In *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988), Chancellor Allen held that not all board action which impedes the effective exercise of a stockholder vote is *per se* invalid. Rather, when a board acts "for the primary purpose of impeding the exercise of stockholder voting power," the board "bears the heavy burden of demonstrating a compelling justification for such action." *Id.* at 661. The Delaware Supreme Court adopted *Blasius* in *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118 (Del. 2003). "For the *Blasius* standard to be invoked, the challenged action had to be taken for the sole or primary purpose of thwarting a shareholder vote." *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 258 (Del. Ch. 2013) (citing *Blasius*, 564 A.2d at 662); *accord Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at \*14 (Del. Ch. Oct. 13, 2021). Neither side has presented this expedited injunction action through that lens. Indeed, *Hubbard* found that *Blasius* was not the appropriate framework in that case. *Hubbard*, 1991 WL 3151, at \*10 n.11; *see also Rosenbaum*, 2021 WL 4775140, at \*14 ("[T]he Court will not draw upon *Blasius* unless the evidence reveals the Board engaged in 'manipulative conduct' in responding to the Nomination Notice."). The court, therefore, addresses the claims here as the parties have presented them.

44

added him to the board and prevented the board from amending or waiving its advance notice requirement. *Id.* Hubbard quickly obtained the support of a majority of the other directors to take the company in his proposed new direction. The other board members, now the minority faction, sought to run their own slate of directors and filed an action to enjoin the company from enforcing the agreement and the advance notice bylaw. *Id.* at \*4. The court noted that:

> This is not a case where the shareholders, unprovoked by any board action, unilaterally and belatedly changed their minds and decided to nominate a slate of candidates for director. In such a situation, relief should clearly be denied. Rather, this is a case where the . . . board itself took certain action, after the by-law nomination deadline had passed, that involved an unanticipated change of allegiance of a majority of its members. It was foreseeable that that shift in allegiance would result in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction. Such material, post-deadline changes would also foreseeably generate controversy and shareholder opposition. Under those circumstances, considerations of fairness and the fundamental importance of the shareholder franchise dictated that the shareholders be afforded a fair opportunity to nominate an opposing slate, thus imposing upon the board the duty to waive the advance notice requirement of the by-law.

*Id.* at \*12. Under *Hubbard*, where the key facts upon which a stockholder would decide to nominate candidates or make proposals are "inherently unknowable until after the nomination deadline had expired" and the board's actions cause this significant change in circumstances, it is inequitable for the board to continue to bar stockholder nominations under the advance notice bylaw. *Id.* at \*11–12.

45

Twenty-three years later, in *AB Value*, a stockholder sought a temporary restraining order to enjoin an advance notice bylaw and run a competing slate. 2014 WL 7150465. Relying on *Hubbard*, the plaintiff argued that after the advance notice deadline had passed, the company had distributed a 37.2% voting bloc previously held in trust to four trust beneficiaries, had unanimously approved salary increases for the co-presidents of the company, and had included errors in its meeting notice. *Id.* at *2. The court noted that the standard for invoking *Hubbard*, a context-specific application of *Schnell*, was high and required the plaintiff to provide compelling facts indicating that enforcement of the bylaw was inequitable. *Id.* at *5. The court distilled the *Hubbard* framework to three questions: "First, did the change in circumstances occur after the advance notice deadline? Second, was the change 'unanticipated' and 'material'? Third, was the change caused by the board of directors?" *Id.* at *5.

Applying a preliminary injunction standard, the court denied the motion. The court rejected plaintiff's argument as to the trust distribution, noting that the board had nothing to do with the dissolution of the trust. While such a change may, in fact, radically alter the playing field for a proxy context, stockholder composition changes frequently and "the Court's focus is on the board and material actions taken by the board that substantially alter the direction of the company." *Id.* at *6. The court found the pay increases for management insufficient to satisfy *Hubbard* because

46

they did not "constitute a radical shift in corporate direction" as they neither changed the operations nor the business direction of the company. *Id.* at \*7. The court likewise rejected the plaintiff's argument regarding inaccurate disclosures, noting that the information came to light before the notice deadline and "[fell] short of *Hubbard*'s material or radical change standard." *Id.*

Plaintiffs rely on two other decisions where this court granted motions to expedite claims to enjoin the enforcement of advance notice bylaws. In *Healthcor Management, L.P. v. Allscripts Healthcare Solutions, Inc.*, C.A. No. 7557-CS (Del. Ch. May 25, 2012) (TRANSCRIPT), the CEO and four out of nine directors resigned after the deadline for nominations had closed. The court noted that such a change was extraordinary and was not a typical circumstance in the life of a company. *Id.* at \*4. The court found that the events, which the board itself acknowledged would result in the board proposing to seat a very different board, "raise[d] a colorable equitable question about whether the board can hide behind the advance notice by-law and retain for itself the flexibility to change the shape of the board in a fundamental way shortly before the meeting and deny the other stockholders the ability to react to it." *Id.*

In *Icahn Partners LP v. Amylin Pharmaceuticals, Inc.*, 2012 WL 1526814 (Del. Ch. Apr. 20, 2012), the board inexplicably refused to engage with a potential acquirer that offered a substantial premium at a time when the board and

stockholders were contemplating a sale of the company. *Id.* at *3. The court granted the motion to expedite, explaining that the plaintiffs had adequately alleged that the rejection of the offer evinced the board's radical change of plans for the company. *Id.*

### 2. The *Hubbard* Standard

The parties disagree on what a plaintiff must prove to establish a claim under *Hubbard*. Plaintiffs point to *AB Value*, which "read[s] *Hubbard* as requiring a material change in circumstances, which the case alternatively describes as a 'radical shift in position,' caused by the directors that occurs after the advance notice deadline." *AB Value*, 2014 WL 7150465, at *5. Plaintiffs equate the terms "radical" and "material," and conclude that materiality under *Hubbard* is the same as the materiality standard governing proxy disclosures to stockholders.[218] In the disclosure context, "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 499 (1976)). There must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotations omitted). Thus, Plaintiffs seem to argue that they

---

[218] Pls.' Reply Br. 8.

48

can succeed on the motion if there is a substantial likelihood that a stockholder would consider any of the board's conduct after February 15 important to know in deciding whether to run a proxy contest.

Plaintiffs' attempt to import the disclosure standard of materiality into *Hubbard* relies on *Sherwood v. Ngon*, 2011 WL 6355209 (Del. Ch. Dec. 20, 2011). That reliance is misplaced. In *Sherwood*, plaintiff stockholders sought a temporary restraining order to enjoin an annual meeting where three days before the then-scheduled meeting, the board removed an agitating director from the company's previously disclosed slate of directors. *Id.* at \*4. The company did not immediately announce the director's removal from the slate, but it did announce an approximately two-week delay in the annual meeting. *Id.* The director's removal from the slate was not announced until nine days before the new meeting date. *Id.* The plaintiff stockholders argued that the company's disclosure regarding the removal of the director from the slate was materially misleading and moved to enjoin the annual meeting to provide stockholders with sufficient time to consider corrective disclosures. *Id.* at \*5.

Although the *Sherwood* court discussed certain factual similarities between that case and *Hubbard*, the question in *Sherwood* was not whether the board had a duty to waive enforcement of its advance notice bylaw. The plaintiffs argued, and the court agreed, that defendants' deferral of the meeting reopened a ten-day window

49

for nominations, with which the plaintiffs complied. *Id.* at *11. The question before the court in *Sherwood* was whether the plaintiffs had adequately stated a colorable disclosure claim. *Id.* at *15.

To the extent Plaintiffs argue that they need only establish that there has been a post-deadline disclosure or discovery of an omission about the company or a nominee that would satisfy a preliminary injunction, they are mistaken. Neither *Hubbard* nor *AB Value* stands for that proposition.[219] Rather, "the Court's focus is on the board and material actions taken by the board that *substantially alter the direction of the company*." *AB Value*, 2014 WL 7150465, at *6 (emphasis added); *see Icahn*, 2012 WL 1526814, at *3 (indicating that plaintiffs might prevail if they could show that the board "radically changed its plans for the Company" by refusing to engage with a potential acquirer in light of the company's previously stated investment thesis).[220]

---

[219] One of the grounds for the plaintiff's claim in *AB Value* was an error in the meeting notice. The court observed that the information came to light before the nomination deadline "and falls well short of *Hubbard*'s material or radical change standard." 2014 WL 7150465, at *7. The court did not indicate that it was applying a disclosure standard.

[220] In *Hubbard*, the court was persuaded that the "material, post-deadline changes would also foreseeably generate controversy and shareholder opposition." 1991 WL 3151, at *12. That quotation must be assessed within the overall context of the case, and understood within the court's finding that the allegiances of a board majority had shifted to take the company in a different direction after the nomination deadline, coupled with the board's having contractually prohibited the company from waiving the bylaw.

As the court cautioned in *AB Value*, "Delaware jurisprudence that makes clear that compelling circumstances must exist before the equitable powers invoked in *Hubbard* (based on *Schnell*) will be applied." 2014 WL 7150465, at *5. In *Hubbard*, the compelling circumstances that justified waiving the advance notice bylaw included a shift in board-level allegiance that "would result in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction," and a contractual agreement not to waive the bylaw. 1991 WL 3151, at *12. In *Icahn*, under the colorable claim standard of review, the compelling circumstance that warranted expedition was the board's unexpected decision to reject, without consideration, a company-altering buyout offer. 2012 WL 1526814, at *2–3. In *Healthcor Management*, the resignation of four out of nine directors after the deadline for nominations had closed warranted expedited treatment of a claim to require waiver of the bylaw. C.A. No. 7557-CS, at *4. The court in *Healthcor* stated:

> When there's an *extraordinary* change like this, and the board itself feels a board majority is essentially going to propose to seat a very different board, that, in my mind, raises a colorable equitable questions about whether the board can hide behind the advance notice by-law and retain for itself the flexibility to change the shape of the board in a *fundamental way* shortly before the meeting and deny the other stockholders the ability to react to it.

*Id.* (emphasis added).

51

Plaintiffs do not argue that the revelations regarding Hernandez and his family's related party transactions constitute fundamental changes to Cano so as to trigger *Hubbard*. Indeed, they cannot, because they do not involve action of the board. *AB Value*, 2014 WL 7150465, at *6. Instead, Plaintiffs frame their claim around the board's response to Hernandez's conduct and the fissure between Plaintiffs and the other outside directors.

### 3. The Alleged Radical Shift

Plaintiffs have asserted a moving target of post-deadline "material" changes as supporting their claim. They first asserted in discovery that there are 17 different bases for their claim.[221] They next cited five distinct events in their opening brief and then provided a list of seven "material facts" at oral argument.[222] For the reasons that follow, Plaintiffs fail to establish a reasonable probability of success on their *Hubbard* claim.

### a. The August 27, 2022 Meeting of Committee Chairs

Plaintiffs first point to the August 27, 2022 meeting of committee chairs over the Camerlinck Loan. Plaintiffs insist that this meeting was concealed from them until after February 15, 2023. Plaintiffs admit that they learned about the loans

---

[221] Ex. 245 at 8–17.

[222] Pls.' Opening Br. 2; Tr. 12:16–14:10; *id.* at 16:7–18:24.

before the February 15 close of the nomination window and do not base their claims on the loans' existence.[223]

Plaintiffs also received information regarding the August 27 meeting of committee chairs prior to the close of the nomination window. Minutes of the Audit Committee's February 8, 2023 meeting reflect a discussion of the Camerlinck Loan and other Hernandez loans.[224] Gold is listed as present at the meeting.[225] At the February 8, 2023 meeting, Armstrong recounted that the August meeting of board chairs had occurred and described the meeting's participants and its outcome: that no further action was required.[226] "There was no disagreement by the Committee

---

[223] Tr. 12:11–20. Both Cooperstone and Gold had reason to know about the Camerlinck Loan in August 2022. Cooperstone testified that he was generally aware of the loan. Cooperstone Dep. at 87:8–15. Gold was a member of the Audit Committee and would have access to Armstrong's detailed memo regarding the Camerlinck Loan which was shared with the Audit Committee on August 22, 2022. Ex. 36.

[224] Ex. 223 at '112–13.

[225] *Id.* at '111.

[226] The meeting minutes describe this disclosure as follows:

> David Armstrong reminded the Committee the record shows between August 17, 2022 and August 27, 2022 multiple Board disclosures were made including reports to both the Chairs of the Audit Committee and the Nominating and Corporate Governance Committee and a memorandum was posted to Diligent for the entire Audit [C]ommittee on the issue. Following these disclosures, the Chair of the Nominating and Governance Committee convened a special meeting of all Committee Chairs to discuss the personal loan from Bob Camerlinck. . . . During an hour-long meeting the personal loan from Bob Camerlinck was discussed in detail, all Committee chairs asked questions, Board counsel asked questions, Hernandez answered all questions and the Board was informed that Audrey Leigh, Company

53

that these events as described did in fact transpire in August 2022."[227] Aiello advised the Audit Committee on February 8 that "following Weil's investigation they determined that the personal loans did not constitute related party transactions, are not disclosable, and" should not be disclosed in the upcoming 10-K.[228]

In an email to the Audit Committee on February 9, 2023, Armstrong discussed the prior retention of Weil in August 2022 in connection with the Camerlinck Loan and that Weil was handling the matter for the board "when we held a special Board call (of Committee Chairs) to review this matter . . . on August 27, 2022."[229] Gold was copied on this email.[230] These documents refute Plaintiffs' argument that they did not know and could not have known about the August 27 meeting prior to the February 15 nomination deadline. Gold's failure to read or remember these communications is no excuse. In any event, Plaintiffs fail to show that a meeting among committee chairs in August 2022 constituted board action that radically

---

disclosure counsel (Goodwin Proctor) had advised no disclosure was required including no 8-K. At the conclusion of the August 27, 2022 meeting the Committee Chairs accepted management's presentation, excused management to conduct an executive session, and thereafter took no further action.

*Id.* at '112–13.

[227] *Id.* at '113.

[228] *Id.*

[229] Ex. 224 at '038.

[230] *Id.* at '037.

changed the direction of the Company. Indeed, as Cooperstone reminded Gold and Sternlicht on February 6, 2023, even if the loans violated internal corporate policy, three law firms advised that Hernandez's loans did not need to be publicly reported.[231]

### b. The "Shadow Board"

Plaintiffs claim that Trujillo, Morales, Muney, and Rivera formed a "Shadow Board" in January 2023 through which they decided not to renominate Cooperstone and concealed the results of Hernandez's 360 Report.[232] As an initial matter, a conversation that took place between individual directors is not board action as required by *Hubbard* and *AB Value*. *See Hubbard*, 1991 WL 3151, at *12 ("[T]his is a case where the . . . board itself took certain action, after the by-law nomination deadline had passed, that involved an unanticipated change of allegiance of a majority of its members."); *AB Value*, 2014 WL 7150465, at *6 ("[T]he Court's focus is on the board and material actions taken by the board that substantially alter the direction of the company."). The Cano board took no action to conceal the results of the 360 Report. Admittedly, it was not delivered to the full board until after February 15, but that did not reflect a board decision that materially altered the

---

[231] Ex. 83 ("I've heard directly from Goodwin that they agree with Weil that no disclosure is required. That was the original advice from McDermott [Will & Emery]. So three law firms agree on this.").

[232] Pls.' Opening Br. 17–19, 50–51.

direction of the Company. In any event, Plaintiffs were aware well before February 15 that some members of management had concerns about Hernandez, having been privately contacted by multiple members of management.[233]

Plaintiffs' assertion that the board secretly agreed not to nominate Cooperstone on management's 2023 slate is also unfounded. Cooperstone resigned before the board decided on the 2023 slate. Plaintiffs point to private email and text conversations among certain directors showing that Morales, Muney, and Rivera decided not to support Cooperstone's nomination.[234] Yet Plaintiffs concede that there was no board-level, or even committee-level, action resolving not to include Cooperstone on the slate.[235] What might have happened had Cooperstone not resigned is conjecture. *See AB Value*, 2014 WL 7150465, at *7 & n.40 ("This Court cannot grant the extraordinary relief of enjoining a Company's facially valid advance notice bylaw on the basis of hypothetical future events." (citing *Openwave*, 924 A.2d at 240 ("Because Delaware law does not permit challenges to bylaws based on hypothetical abuses, the court will not consider those scenarios."))).[236] Plaintiffs'

---

[233] Ex. 78 (Cooperstone email on February 4, 2023 noting "the fact that the faith of multiple members of [Hernandez's] management team is I think irretrievably lost."); Ex. 73 (Sternlicht February 1, 2023 email: "Our two moles are reaching out every day."); Ex. 40 at 9; Ex. 55; Ex. 149.

[234] Ex. 86; Ex. 94.

[235] Tr. at 15:1–6.

[236] Plaintiffs have cited no evidence that the Governance Committee or any subset of the board had suggested an alternative nominee to Cooperstone.

56

allegations are speculative and do not concern board action and therefore cannot support a *Hubbard* claim.[237]

### c. Creation of a Special Committee

Plaintiffs next contend that the board's creation of the Special Committee on March 17 "fundamentally changed the composition of the Board."[238] Defendants concede that the board created the Special Committee after the notice deadline, but they argue that its formation does not constitute the type of change sufficient to require a waiver of the advance notice bylaw. Defendants point to the fact that the Special Committee took no action binding the Company, but rather only made recommendations to the board, which it could then vote to approve or reject.

Plaintiffs, and particularly Sternlicht, were the impetus for creation of the Special Committee. Sternlicht had become increasingly aggressive in his pursuit of a sale of the Company, and on March 2, sent an email to the board threatening to resign and issue a public statement if Hernandez were not removed as CEO.[239]

---

[237] This case is readily distinguishable from *Sherwood*, which, while not a *Hubbard* case, involved a circumstance in which a board removed a nominee from its slate and advanced the meeting date just before the annual meeting was meant to take place. *Sherwood*, 2011 WL 6355209, at *5 (focusing on the misleading nature of a disclosure describing why a director was removed from the slate). Had Cooperstone remained on the board and not been renominated after the deadline, his claim might be much stronger. *See Hubbard*, 1991 WL 3151, at *11 (indicating that minority directors should not be compelled to nominate a dissident slate to protect against a potential "electoral coup" by the majority after the nomination deadline).

[238] Pls.' Reply Br. 17.

[239] Ex. 107 at '656.

Defendants viewed Sternlicht's potential public statement as a threat to the Company, and they sought counsel familiar with activist investors and formed a Special Committee to address it.[240] Between the Special Committee's formation on March 17 and March 25, the Special Committee held four meetings to discuss how to address the public relations risk posed by Sternlicht's threats and paths forward as to Hernandez's conduct.[241] While Plaintiffs label the Special Committee as a strategic ploy to silence them, placing Sternlicht or his cohort on a special committee designed to address the negative effects of Sternlicht's public condemnation of the Company would be like "putting a fox on the special committee for henhouse security."[242]

In arguing that the formation and function of the Special Committee constitutes a radical change in the direction of the Company, Plaintiffs focus on

---

[240] Ex. 106; Rivera Dep. 195:20–196:4 ("[T]here was a real concern about whether or not we needed to take steps to make sure that the board and the company were doing the right things to protect themselves."); Ex. 4 ("Muney Dep.") at 113:14–114:2 ("[W]e acted as a Special Committee on behalf of the shareholders to lay out all the options on a number of issues to bring to the full board for discussion, as I stated earlier, because of Barry's letter and because the prior attempts at board meetings to have discussions on issues such as assets, we couldn't have a discussion because the three board members were adamant and not willing to discuss other options with facts.").

[241] Ex. 232 at '709 ("[T]he Committee's main concern is not about Mr. Sternlicht's message, but rather his behavior and the manner in which he is choosing to convey his message."); Ex. 233 (discussing the potential retention of a public relations firm); Ex. 234 (deliberating about which public relations firm to hire and reporting on discussions with Sternlicht's counsel); Ex. 236 (discussing public relations concerns and formulating recommendations for the full board regarding Hernandez's infractions).

[242] Tr. 97:15–16.

language in the Special Committee's charter which they claim gave the committee "unfettered plenary power" and eliminated any "dissenting voices."[243] The Special Committee's charter is admittedly broad, giving the committee full authority to take actions that it "may determine are necessary or advisable in connection with the Purpose of the Committee."[244] The committee's authority is not plenary, but cabined by the scope of its purpose. The "Purpose" of the committee was multifold, including to evaluate how to strategically position the Company and to investigate relationships between directors and management and potential conflicts of interest by the board, all of which were "in response to . . . Sternlicht's plan to publicly disclose his critiques of the Company."[245] And in actual function, the Special Committee did not independently act to bind the Company. Rather, it made recommendations to the board, which it then discussed and voted upon.[246]

The creation of the Special Committee did not constitute a "significant change in corporate direction or policy." *Hubbard*, 1991 WL 3151, at \*12. Unlike in *Hubbard*, where a subset of the board, constituting a majority, switched from opposing a dissident stockholder's proposals to supporting them, the creation of the

---

[243] Pls.' Opening Br. 32.

[244] Ex. 127 at '830.

[245] *Id.* at '829.

[246] *See, e.g.*, Ex. 158 at 5 ("[Rivera] informed the Board that the Special Committee has a broad charter and that the Committee is simply making recommendations to the Board at this time to discuss together").

59

Special Committee did not represent a radical shift in position or material change in the direction of the Company. Plaintiffs were a three-member minority of the board. They took a strong view that the Company should be sold promptly and that Hernandez should be terminated. They never had a majority of the board in their camp who suddenly switched allegiances and radically changed the direction of the Company. In that regard, the formation of the Special Committee did not even change the status quo, let alone radically shift board allegiances like in *Hubbard*.

### d. The March 30 Decision

Plaintiffs next argue that the Special Committee's recommendations and the board's adoption of those recommendations proves that the board was unwilling to remediate Hernandez's misconduct. The evidence does not reflect board inaction. *See Hubbard*, 1991 WL 3151, at *10 (observing that from a legal viewpoint "'inaction' and 'action' may be substantive equivalents, different only in form"). Rather, the board members were attuned to the issues raised about the CEO and acted.[247] The board, upon recommendation of the Special Committee, held a one-

---

[247] *See* Ex. 132 ("I believe we need to ask Weil to investigate immediately and thoroughly today's list. Whatever the inquiry shows we will have to deal with it."); Ex. 234 ("Committee members noted that the undisclosed margin loan and related party transactions have been thoroughly investigated and resolved at significant cost to the Company. It was agreed that the Board should confirm that the proper controls are in place and vote on a resolution to close out this investigation."); Ex. 236 (discussing, at length, the pros and cons of retaining Hernandez as CEO, including Hernandez's key relationships with providers and patients, stockholder perception of Hernandez, the lack of suitable public company CEO replacements, and Hernandez's suitability in the short-term).

hour and forty-five-minute board meeting on March 30, with Plaintiffs present. The board majority did not radically change the direction of the Company, but rather favored a less radical approach than what Plaintiffs had been advocating. The majority did so after concluding that Hernandez's removal as CEO at that time, with no successor in place, would not be in the Company's best interest.[248] This court expresses no view as to whether the board's decision was "good" or "bad" in a business sense. *See Hubbard*, 1991 WL 3151, at \*12. What matters is that the Special Committee made recommendations, the full board was presented with those recommendations, and the board voted. Plaintiffs' dismay at having been outvoted in these circumstances does not create a radical shift in the fundamental operation of the Company as contemplated in *Hubbard*.

Notably, what Plaintiffs frame as an abdication actually reflects the adoption of many of Weil's suggestions from February 5.[249] The idea of separating

---

[248] *See* Ex. 247 at '501 ("[T]he Special Committee noted that the believe it is in the Company's best interest to allow Dr. Hernandez additional time to make adjustments in response to the action items presented in connection with the recommendations during the next few quarters, in particular given the critical role he plays with the physicians and the human capital-centric business model of the Company's business."); Ex. 158 at '356 ("The Committee members feel that they can give [Hernandez] more time to make adjustments and, in the meantime, the Board can consider alternatives in the even the is unable to make those adjustments."); *id*. at '358 ("There is also a consensus that the [Special Committee's] recommendations are not permanent and can always be changed in new circumstances/findings arise.").

[249] *See* Ex. 218 (recommending that the board address Hernandez's failure to abide by the Conflict of Interest Policy, consider strengthening compliance procedures, engage an

Hernandez's roles as CEO and chairman had long been on the table. Sternlicht had expressed his distaste for this approach in a February 27 email to his fellow directors.[250] The directors included a potential separation of these roles as among potential remedial actions discussed in a meeting on March 7.[251] Ultimately, the Special Committee, after discussion, decided to recommend that Hernandez be removed as board chair and presented that proposal to the full board.[252]

The Special Committee's professed predetermination of its recommendations regardless of the outcome of Weil's investigation at the March 30 meeting is troubling. When asked why the Special Committee made recommendations without hearing the entirety of Weil's report, Muney responded that "the recommendations would have been the same no matter what the outcome of the investigation is/was."[253] On the other hand, Trujillo had informed the board on March 27, 2023 that, although they needed to take action urgently, "[i]f Weil's report ultimately includes information that sheds new light on the topic of the CEO or anyone else,

outside consultant for training on board and corporate communications, consider enacting policies related to personal loans to executive officers).

[250] Ex. 107 at '657 ("Bringing in a Chairman will not have the same impact on the stock and if the stock were to rise $1 because Marlowe is not CEO, he will benefit immensely by being able to hold on to some of his shares. Id like to vote on the issue shortly. I have stated my position clearly and I will reserve all my rights as a substantial stockholder and in the street's eye, the sponsor of this debacle.").

[251] Ex. 114 at 2.

[252] Ex. 234 at '715.

[253] Ex. 158 at 5.

we can consider it then, but I don't believe that would change any of our minds with respect to decisions in other critical areas."[254] He confirmed this in the board meeting, explaining that the Special Committee was not dismissing the findings of any report, but was of the view that "they are not willing to terminate the CEO without a plan to keep the Company going."[255] In another meeting of the Special Committee on March 30, 2023, the committee noted that it "would likely have later changed its recommendation if evidence of wrongdoing was found."[256] While Muney appeared to be defensive of Hernandez, other directors, such as Trujillo and Rivera, were much more open minded.[257]

Plaintiffs' disagreement with the Defendants' chosen remediation plan does not make that moderate course of action a radical shift in the business or management of the Company. As a result, it does not support a *Hubbard* claim.

---

[254] Ex. 238.

[255] Ex. 158 at 7.

[256] Ex. 239 at '722.

[257] *See* Rivera Dep. 217:19–218:16 ("[W]e knew the recommendation, but we were waiting to hear what people had to say and whether or not there was any other reasonable alternative for a thoughtful solution that was going to be proposed. The point was to anchor the discussion on the problem, what needed to be resolved, what we thought was the most viable path. But anyone in that meeting was welcome to put forward alternate proposals, talk about, you know, why certain things made sense or didn't make sense and it was always supposed to be a full board vote. If there is one thing that I do know about this board, there are several members of this board who you cannot predict what their vote is going to be until they've heard all the discussion and debate. So it was not a foregone conclusion.").

### e.    Appointment of Trujillo as Chairman

Plaintiffs next allege that the board's appointment of Trujillo as chairman constituted a material change the operation and management of Cano. Plaintiffs do not attempt to explain how the appointment of Trujillo as chairman requires waiver of the advance notice bylaw under *Hubbard*. Rather, they focus on attacking Trujillo's alleged lack of independence from Hernandez. The logical flaw in Plaintiffs' argument is that if, under their theory, Trujillo is in Hernandez's pocket, his appointment would not substantially change the allegiances of the board or the Company's trajectory. Rather, a loyal Trujillo would continue to steer the company in the same direction advanced by Hernandez. Further, the Plaintiffs' newly minted challenge to Trujillo's independence is undermined by the fact that they signed off on Cano's SEC disclosures representing that Trujillo is independent[258] and that they voted in favor of his appointment as Lead Independent Director.[259] In any event, Sternlicht admitted that there was no fundamental change as a result of Trujillo's installation as chairman: "He acted as the chairman of the board when he was lead

---

[258] Ex. 27 at 1.

[259] Trujillo Dep. 24:25–25:5 (noting that the board unanimously voted to appoint Trujillo as Lead Independent Director).

director. Nothing changed."[260] Trujillo's appointment as chairman does not support Plaintiffs' claim.[261]

### f.    The Abandoned Onsite Dental Stock Sale

Plaintiffs argue that the circumstances surrounding Hernandez's wife's possible sale of Onsite Dental support their theory of a radical change in allegiances. They do not. Stephanie Hernandez acquired her stake in Onsite Dental after Onsite Dental acquired her business, Dental Excellence Partners, in April 2022.[262] In connection with that transaction, Cano entered into a dental services administration agreement with Onsite Dental.[263] At a March 20 board meeting, Gold raised an issue as to the transaction, alleging that the board had not been informed of Hernandez's wife's involvement in the transaction or the terms of the resulting agreement.[264] As Gold was later reminded, the acquisition of Dental Excellence Partners, the subsequent agreement with Onsite Dental, and the involvement of Hernandez's wife

---

[260] Sternlicht Dep. 203:20–22.

[261] Plaintiffs' counsel conceded at argument that removal of Hernandez as CEO would not constitute a fundamental change in the operation and management of Cano warranting waiver of the bylaw under *Hubbard*. Tr. 60:10–61:11. If his removal as CEO would not constitute a *Hubbard* change, the court is hard pressed to see how his removal as chairman and replacement with the Lead Independent Director would satisfy Plaintiffs' burden.

[262] Ex. 28; Ex. 35.

[263] Ex. 35.

[264] Ex. 131 at '041.

were disclosed to the board and were approved two separate times.[265] They were also publicly disclosed.[266]

Plaintiffs argue that in April 2023, Kiran Patel, an individual who wanted to become involved with Cano, sought to purchase Stephanie Hernandez's interest in Onsite Dental for $20 million.[267] This transaction did not receive all necessary approvals from Onsite Dental, and accordingly, was not consummated.[268] The transaction did not involve Cano and the board was not asked to approve it. This unexecuted transaction could not have caused a material or radical change in Cano's circumstances.

### 4. The Plaintiffs' Conduct

Plaintiffs accept that the court must evaluate their claims in light of the circumstances of these particular plaintiffs.[269] The record here demonstrates that the Plaintiffs sought to nominate a competing slate before the occurrence of the changes they allege here. In pursuit of that aim, they schemed to delay pressing their proxy

---

[265] Ex. 199 at '486 ("The Onsite Dental/Stephanie Hernandez/Pedro Cordero issues were all raised to this Board and approved at least twice – first November 29, 2021 and second on March 15, 2022. During this time the full proposed terms of the agreement were provided, and the related party transaction was approved with full understanding of the exclusive terms of the agreement, Stephanie Hernandez's ownership and Pedro Cordero's Board seat were all approved.").

[266] Ex. 35.

[267] Pls.' Opening Br. 44.

[268] Hernandez Dep. 153:18–154:2.

[269] Tr. 110:9–13.

66

contest in the hopes that the board would unwittingly reopen the nomination window.

On March 11, Cooperstone sent Sternlicht and Gold an email mapping out a plan.[270] Their goal? Force the Company to either buy them out or to sell the Company entirely. Cooperstone wrote, "This is my suggestion for how to proceed with the threat of a noisy resignation to secure the board votes we need."[271] They would demand that the board authorize a banker to immediately conduct an auction for Company and to remove Hernandez as CEO, replaced by Gold as interim CEO.[272] If this did not occur, Cooperstone would threaten to resign.[273] Cooperstone wrote:

> The threat of this noisy resignation may move the Board to act. We should use that threat as other board members then have a risk of damage to their reputations (Kim, Alan) as well as increased potential for additional class actions. My goal would be to a negotiated outcome that enables the company to be sold.
>
> However, if we were to proceed [in] this manner it would further devalue company stock causing injury to all remaining shareholders including our investors and friends/family supporters. If the board [sic] vote does not go our way, as a fallback, I suggest we pursue the sale of our collective position. . . . The new investors' plan would be to take our board seats and then they would acquire their way to 50% and take

---

[270] Ex. 227.

[271] *Id.* at '390.

[272] *Id.* at '391.

[273] *Id.* at '392.

the company private or use the 2024 proxy season . . . to take full control.[274]

The next day, Sternlicht forwarded a letter designed "to scare the holdouts" to Cooperstone and Gold.[275] The Plaintiffs planned to deliver their "scathing condemnation[s]" to the board and to make clear that they will "consider resignation if the vote goes the wrong way."[276] "If the board does not go our way, we can regroup and consider next steps."[277] Sternlicht, Cooperstone, and Gold discussed running a proxy contest to fill Muney and Rivera's seats with candidates of their choice.[278] Each of the Plaintiffs were aware that the period for stockholder proposals had closed on February 15, 2023. Yet the Plaintiffs did not then demand that the board reopen the nomination period. Rather, they intentionally remained silent, hoping that the board would overlook the terms of the advance notice bylaw and set the annual meeting date after July 16, which would reopen the nomination period by default.[279] That bet did not pan out.

---

[274] *Id.* (cleaned up).

[275] Ex. 228 at '361.

[276] *Id.* at '360.

[277] *Id.*

[278] Ex. 230 (inclosing an email from Sternlicht in which he states, "we could launch a proxy fight to oust Kim and Alan. That would give us me, you [(Cooperstone)], lew and our two people.").

[279] Ex. 231 (noting that the nomination period would reopen if the annual meeting is held after July 16 and stating: "What is critical now is that we not ask the Cano people or other board members any questions around the proxy or the annual meeting. I think they are oblivious to the implications of the timing.").

Plaintiffs saw the writing on the wall. Cooperstone's company retained counsel on March 17, 2023 "in connection with [its] investment in Cano Health" and Sternlicht followed along four days later.[280] But the Plaintiffs were in no hurry to take action. In a WhatsApp message on March 17, 2023, Cooperstone told Gold and Sternlicht that there is "No need to rush here - time is actually building some leverage for us."[281] On March 21, Plaintiffs hatched their current strategy to resign and run a slate against the 2023 nominees.[282]

Plaintiffs exploited their leverage-building lethargy. Following the board meeting on March 30, 2023, Plaintiffs continued to delay. By April 5, 2023, the Plaintiffs had a proxy adviser and had received notice that the Company intended to hold its annual meeting on June 28, 2023.[283] But despite having just under 84 days until the annual meeting, Plaintiffs waited nine days to send a letter demanding that the Company reopen the nomination period.[284] Even then, they did not deliver a nomination proposal. Plaintiffs then waited an additional fourteen days before filing

---

[280] Ex. 181 at 22.

[281] Ex. 197 at '610.

[282] Ex. 134 at '655 (Sternlicht text exchange with Gold and Cooperstone: "And we have one other strategy to deploy gents. Wilkie [sic] Farr said [redacted.] It's a fascinating idea but the three of us opposing these dumb dumbs might work!").

[283] Dkt. 12 at Ex. B.

[284] Ex. 165.

a complaint in this court, dwindling an 84-day head start to around 60 days.[285]  They

did this based on the quickly approaching provisional annual meeting date of June

28, 2023, which was not yet publicly announced.  That date could have been

changed, and it was here, cutting an additional 13 days off of Plaintiffs' already tight

timeline.  In light of these circumstances, the strategy of delay that Plaintiffs

undertook here was not a reasonable one.

When the board did not cave to their demands, Plaintiffs took their alternative

path—framing the board's decisions and responses to Plaintiffs' demands as

"material changes" worthy of reopening the nomination window.  Plaintiffs' actions

bring two venerable maxims of equity to mind.  First, "equity aids the vigilant, not

those who slumber on their rights." *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del.

1982).  Second, "[a]ll plaintiffs seeking the aid of equity's extraordinary remedies

do so subject to the maxim that he who seeks equity must do equity." *Richard Paul,

Inc. v. Union Imp. Co.*, 91 A.2d 49, 54 (Del. 1952).  Taking the Plaintiffs' allegations

together, they do not constitute fundamental changes in the operation and

management of Cano to compel waiver of the advance notice bylaw under

---

[285] *Cf. Schnell*, 285 A.2d at 439 (holding that plaintiffs did not unreasonably delay when they filed suit five days after unofficially learning of management's changes to the date and location of the meeting).

70

*Hubbard*.[286]   The powerful tool of *Schnell* is "reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right." *Alabama By-Products Corp. v. Neal*, 588 A.2d 255, 256 n.1 (Del. 1991).

Plaintiffs decided to nominate a competing slate in early March, and in furtherance of that goal, launched a ploy to strategically delay and ultimately, to assert claims of material post-deadline change that are both pretextual and insufficiently radical under in *Hubbard* and *Schnell*.  In these circumstances, relief must be denied.  Plaintiffs cannot establish a reasonable probability of success on their claim.

## B. Irreparable Harm

An essential condition of preliminary injunctive relief is the threat that irreparable harm will befall the plaintiffs between now and trial unless an injunction issues. *Kingsbridge Cap. Gp. v. Dunkin' Donuts, Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989).  "'Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their

---

[286] Plaintiffs also suffer from credibility problems.  For example, they alleged in their verified complaint that they did not learn of the Camerlinck Loan until March 7.  Compl. ¶ 52.  While the other two plaintiffs were quicker to admit the statement's falsity, Sternlicht doubled down on the allegation, arguing that despite board minutes marking him present for a discussion of the loan, he must have "left the room" or "wasn't there."  Sternlicht Dep. 61:19–62:14.

shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors.'" *Hubbard*, 1991 WL 3151, at *5 (quoting *Int'l Banknote Co., Inc. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989)); *see Icahn*, 2012 WL 1526814, at *3. However, where a plaintiff's imminent, irreparable injury is self-inflicted, equity will not come to her rescue. *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4890876, at *2 (Del. Ch. Oct. 20, 2021) ("While I recognize that prohibiting a stockholder from exercising her franchise rights can amount to irreparable harm, in this case, any such harm is, in large measure, self-inflicted.").

Plaintiffs' decision to resign from the board after they knew that the nomination deadline had passed was part of a strategic plan to pressure the board to agree to a buyout or to replace the CEO with someone aligned with Plaintiffs' strategy. They intentionally delayed in seeking to waive the bylaw and to assert their claims until their strategy played out and the board did not accede to their demands on March 30. Any harm to these Plaintiffs, who chose to leave the board and to sit on their claims, is self-inflicted.

### C. Balance of the Equities

The final element of the preliminary injunction framework is the balance of harms. Even assuming that Plaintiffs will suffer irreparable harm if they are unable to run their slate, the balance of equities favors Defendants. Plaintiffs' admitted strategy of delay and orchestrated pressure campaign were designed to create a

burdensome exigency. *Louisiana Mun. Police Emps.' Ret. Sys. v. Crawford*, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007) (considering the self-inflicted nature of the harm in the court's evaluation of the court's balancing of the equities).

Plaintiffs strategically delayed in pursuing a proxy contest and bringing suit, forcing Defendants to litigate this case on a burdensome, expedited basis and increasing the costs to Cano in connection with its annual meeting.[287] Plaintiffs here failed to timely nominate directors to replace the directors up for election in 2023 despite their significant concerns about the management of the Company. Plaintiffs were not strangers to this Company, but rather were directors with a long-established familiarity with Cano's structure and policies. As their concerns continued to build, they chose to sit back in the hope that time would increase their leverage over the board. Plaintiffs must be forced to live with the consequences of their actions. The balance of equities tips in favor of the Defendants and counsels against the entry of a preliminary injunction.

---

[287] Defs.' Answering Br. 56–57, 59. The policy behind enforcing unambiguous advance notice bylaws is well established. *See, e.g.*, *Saba Cap.*, 224 A.3d at 980 ("A rule that would permit election-contest participants to ignore a clear deadline and then, without having raised any objection, proffer after-the-fact reasons for their non-compliance with it, would create uncertainty in the electoral setting. Encouraging such after-the-fact factual inquiries into missed deadlines could potentially frustrate the purpose of advance notice bylaws, which 'are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations.'" (quoting *Openwave*, 924 A.2d at 239)).

## III.    CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for a preliminary injunction is denied.